### BENNETT *v.* FLEMING.

1. PLEADING — AMENDMENT NUNC PRO TUNC — JUDICATURE ACT — FURTHERANCE OF JUSTICE.

> Where a chancery cause was brought on to be heard in open court, without objection by either party, upon the supposition and theory by both court and counsel that the pleadings were perfected and the cause at issue as to all parties, but it was discovered after conclusion of the proofs and submission of the case that it was not in fact at issue as to all parties, the court was authorized under section 1, chap. 16 of the judicature act (3 Comp. Laws 1915, § 12478), to grant a motion perfecting the pleadings *nunc pro tunc*, where no new elements or issues were brought into the case, and was for the furtherance of justice.

2. CANCELLATION OF INSTRUMENTS—DEEDS—INADEQUATE CONSIDERATION—UNDUE INFLUENCE.

> Evidence that the grantor, 74 years of age, in the last stages of tuberculosis, physically and mentally weakened, deeded his entire property to a stranger in blood at whose house he was a guest, although he was on good terms with his family, for the claimed consideration of support for life, etc., which was left in parol, *held*, in view of the very brief life expectancy of grantor, to support the conclusion of the court below that the deed was not only inequitable because for a grossly inadequate consideration, but was the result of undue influence.

Appeal from Tuscola; Beach, J. Submitted April 10, 1919. (Docket No. 31.) Decided October 6, 1919.

Bill by George T. Bennett against Caroline Fleming and others to correct a description in a deed. Defendants filed cross-bills to have said deed set aside. From a decree for defendants, plaintiff appeals. Affirmed.

*Herbert W. Smith,* for plaintiff.

*Quinn, Wixson & Quinn* (*Walter S. Wixson,* of counsel), for defendants.

---

Authorities discussing the question of undue influence in conveyance or transfer of property in consideration of support of grantor or third person are collated in a note in 52 L. R. A. (N. S.) 477.

STEERE, J.   On April 19, 1915, Alfred Newton, of Gilford, Tuscola county, Michigan, deeded to plaintiff, George T. Bennett, of Attica, Lapeer county, Michigan, by short form warranty deed, "In consideration of one dollar and other valuable consideration dollars," property described in said deed as the "northwest quarter of the northwest fractional quarter of section two (2), town thirteen (13), north range seven (7) east, forty acres more or less." This instrument was recorded in the office of the register of deeds of Tuscola county on April 20, 1915.

Alfred Newton was a widower, then 74 years of age and in poor health. He died intestate at the home of plaintiff on April 30, 1915, eleven days after making said deed. Defendants are his sons and daughters surviving and heirs at law.

On May 11, 1916, plaintiff filed this bill to obtain correction of the description in said deed, alleging that by mistake of the scrivener who prepared the same the premises intended to be conveyed were not correctly described therein, the true description being "the east one-half of the west half of the northwest quarter of section two (2), in town thirteen (13), north of range seven (7) east thereof," the same being what is called a "long forty" instead of a square forty. The bill also alleges that "the other valuable considerations mentioned" in the deed were an agreement by plaintiff, the grantee, "to maintain and support said Alfred Newton in his home, at the township of Attica, Lapeer county, Michigan, during his natural life * * * pay his doctor's bills and to furnish the said Alfred Newton with a decent burial." That said Alfred Newton was to retain possession of said premises during his natural life.

Defendant Southerland filed an answer on November 21, 1916, asking no affirmative relief, and defendants Arthur, Milton, Abram and Frederick Newton

filed an answer on April 19, 1917, in denial and asking as affirmative relief by way of cross-bill, that said deed be set aside.

On May 23, 1917, the cause was brought on to be heard upon pleadings and proofs taken in open court, before the circuit court of Tuscola county, in chancery, without objection by either party and, as stated by the circuit judge in his findings, upon the supposition and theory both by court and counsel that the pleadings were perfected and the cause at issue as to all parties:

"That said proofs were taken and all witnesses in said cause examined by counsel for both plaintiff and defendants, and the hearing thereof by the court conducted upon the theory that the sole issues for determination thereunder were:

"(a) Whether plaintiff was entitled to decree of reformation, as in the bill of complaint prayed; or,

"(b) Whether the deed sought to be reformed should be set aside as affirmative relief to defendants."

It was discovered from an examination of the files after conclusion of the proofs and submission of the case that it was not in fact at issue as to all parties, an amended answer and cross-bill of defendant Southerland and answer and cross-bill of defendants Fleming and Johnson prepared by Attorney T. C. Quinn, deceased some time before, never having been filed. Previous to his death he had sole charge of the defense, and the surviving members of the firm as well as the court and opposing counsel apparently labored under a misapprehension as to the true condition of the pleadings until after the case was submitted. A motion was then made by defendants' counsel for leave to file these answers, which were to the same effect as those filed by the other defendants, and perfect the pleadings *nunc pro tunc* as of May 1, 1917. Finding that such course brought no new elements or issues into the case, and was for the furtherance of justice,

the court granted this motion. No showing, or claim, is made for plaintiff that further proof or time was desired, or the issue as understood and tried on the hearing was changed, or his substantial rights on the merits of the case prejudiced in any particular. Under the situation shown, the course pursued was fully authorized by section 1 of chapter 16 of the judicature act (3 Comp. Laws 1915, § 12478).

Alfred Newton had been a widower for many years. For a time after the death of his wife his youngest daughter kept house for him until she was married, eleven years before his death, after which he lived alone at times in his own home and at other times with some of his children. His children all married and were in homes of their own. Caroline Fleming lived in Flint and Arthur Newton in Pontiac, Michigan. Elizabeth Johnson lived with her husband who was a farmer, in Gilford township, Tuscola county, where deceased bought a farm of 80 acres in January, 1910, to be near his daughter; their places were about a mile apart and while he lived alone much of the time on his own place they were "back and forth" every few days and he was in closer touch with this daughter and her family than the others. He was, however, on friendly terms and corresponded with all his children. He had lived at different times at the home of each of his three daughters—spending entire winters with them. Four of his children resided in California and he had visited them, spending a winter there. For some years he had been in declining health, for relief of which he had doctored and sought relief by change of climate in the west and south. He had sold off one-half of this 80-acre farm and the 40 remaining was all the property he possessed. It was valued at about $3,000 and had upon it a mortgage of $375. He leased portions of this 40 to his son-in-law and others. He and plaintiff were old acquaintances

and friends who had worked together in their younger days and had occasionally visited each other since. Deceased visited plaintiff once or twice a year for many years. During a portion of the winter prior to making this conveyance he had been in Georgia for his health, which was steadily declining, his condition being such that for over six months he had not been able to eat solid food. On his return in March he was at the home of Mrs. Fleming in Flint for a time and then at the home of Mrs. Johnson, from where he went to Bay City to try Christian Science treatment. Mrs. Johnson visited him there once, for but a short time, as she was informed that, being an unbeliever, her presence had a bad influence on his mind. On April 16, 1915, he left Bay City without advising any members of his family and traveled to Attica in Lapeer county. When he arrived there an acquaintance who helped him carry his grip into the station noticed he appeared feeble and had a chill. He said, in reply to an inquiry, that he did not think he could walk from the station to Bennett's, some 40 to 50 rods away, and was taken over there by an acquaintance. His condition was then such that Bennett, who testified "he was somewhat feeble and had a serious and very annoying cough," called a physician for him. During the first week he slept in the house with Bennett. Three days after his arrival Bennett took him to Lapeer to execute the deed in question. Dr. Blakely, the physician called by Bennett, testified that he cared for and treated deceased until his death, prescribing fresh air, rest and wholesome food; that he "seemed to feel the cold terribly—had a species of tuberculosis—had a bad hacking cough," and he directed Bennett to get a tent for him, which was done; that "after he was put in the tent he gradually declined, at the last he grew rapidly worse"; that he visited him seven times, furnishing medicine twice.

As to the doctor's views upon his patient's life expectancy, he was asked and answered as follows:

"*Q.* You regarded him as having been at the point of death from the start?

"*A.* Not from the start, no.

"*Q.* How long before you regarded him so?

"*A.* Just before he was placed in the tent."

No word was received of deceased's serious condition by any of his family until after his death when a telephone message was orally communicated to Mrs. Johnson to the effect that there was a death message for her and "they want you at Attica." She and Mrs. Fleming, of Flint, who had received a similar message, responded at once, arriving at Attica that night, where they were met by Bennett who told them their father had passed away and they had laid him out in a casket. He took them to his house where they had supper and on one of them asking to see their father's remains he lit a lantern and took them to a tent in the back yard where the body was laid out. He explained to them that the doctor had advised a tent for their father, and he had provided one for him about a week before he died. Mrs. Fleming testified that in a conversation upon that subject:

"I asked him—I says 'How did you come to get pa to sleep in a tent?' I says, 'When he was to my place we had to have a hot fire for him—right by the stove?' 'My,' he says, 'your father always did as I wanted him, he would do anything I wanted him to do.'"

These two daughters testified in substance that while they were there Bennett told them their father had given him a warranty deed of his place under which, if so disposed, he "could hold the whole thing," but he had no thought of so doing as it was in effect a trust deed, the understanding with their father being that Bennett should sell the property, take out of the proceeds his own charges for care and burial, give

$200 to deceased's grandson, "little Alfred," and divide the rest between his daughters. Mrs. Johnson testified that before her father's death there had been negotiations between him and her husband relative to purchase of the place by the latter for $3,000, of which she told Bennett in their discussion of the matter and, accepting Bennett's version of his understanding with her father to the effect that it was a trust deed the oral conditions for which would be carried out, she spoke of the possibility of their borrowing the money and buying the 40 acres, saying if they did so the business would be done through Mr. Stacey, cashier of the Akron bank in Akron, whom she requested Bennett to see.

Stacey testified that he first learned of Newton's death from Mrs. Johnson who called to see about borrowing money to buy the place from Bennett to whom her father had deeded it under an oral trust, as above related, proposing to mortgage it and another property for the money, and said Bennett intended to call upon him in reference to the sale; that Bennett did call in a few days and in their discussion stated the "other valuable consideration" referred to in the deed, as to which there was no writing, was the care of Newton during his life and burial at his death, admitting, however, that he was to give Alfred $200; that Stacey discussed the matter of the deed with him; pointed out the inaccuracy in description, told him that under the condition of the title the bank could not accept a mortgage on the property and in the interest of all concerned advised some equitable settlement of the matter, to which Bennett at that time seemed agreeable and after some further discussion he consented that in consideration of $200 for his services and expenses he would quitclaim to the heirs, or estate, and took with him a quitclaim deed which Stacey prepared at his suggestion to be executed by himself

and wife, agreeing to then mail it to either Stacey or the probate court. Bennett admitted the interview as outlined and that he then said Newton requested $200 be given his grandson, but explained it was after the deed had been executed, denied that he ever stated or admitted any trust relations, or that there was any consideration for the deed beyond Newton's care and burial, or that he ever agreed to sign the quitclaim deed Stacey drew up for $200, saying of it: "I took it away, but not with any intention of signing." Some days later Stacey received a short letter signed by Bennett's attorney, as follows:

"May 15th, 1915.

"MR. C. W. STACEY,
"Akron, Michigan.
"*Dear Sir:* Mr. George Bennett was in to see me today and requested me to say that he would not give a deed for the consideration you promised him.
"Yours truly,
"_____,"

It is undisputed that the description in the deed was erroneous, covering but 20 acres of the 40 which Newton owned. It was taken from a copy of a lease given to a tenant the preceding August, over which he had some trouble because of the misdescription. He had shown this lease to Stacey late in the fall of 1914 and consulted him about it, expressing himself as greatly incensed at the blunder made by the party who drew the lease for him. That he should himself so soon thereafter furnish this same faulty lease to the conveyancer in Lapeer from which to describe this property, which was all he owned, is, at least, evidence of extreme forgetfulness.

Plaintiff's present claim to equitable relief in correction of the faulty description in this conveyance is that his alleged oral agreement for care and burial has been performed, and that no other consideration entered into the transaction.

Defendants' claim, both in defense and for affirmative relief by way of cross-bill, is mental incompetency, undue influence, inadequacy of consideration and, at best, that deceased was led to suppose the parol understanding between the parties was enforcible, which as shown by plaintiff's own statements was on his part a trusteeship to sell the property and disburse the proceeds, after fairly compensating himself for deceased's care and burial, amongst deceased's daughters and grandson as directed and understood.

This record by almost undisputed testimony furnishes abundant proof to sustain the equitable features of defendants' contentions. The only fairly debatable issue of fact is deceased's mental incompetency, and we find no occasion to disturb the conclusion reached by the trial court on that issue. Under the undisputed facts shown and evident short expectancy of life of the grantor when the deed was made, the claimed consideration, left in parol, was so grossly inadequate as in itself to be evidential of overreaching and undue influence. The following conclusions of the trial court are well sustained by this record:

"The claimed agreement for support, etc., rested in parol, the very brief expectancy of life of grantor, his extreme age, his enfeebled and weak-minded condition, and the claim made that he sought to convey all the property he possessed to a stranger in blood to the exclusion of his family, with whom his relations were pleasant, leads to the conclusion that such conveyance was obtained by the exercise of undue and improper influence at a time when the grantor was so physically and mentally weakened as to be unable to withstand suggestion, properly safeguard his rights, or realize the legal consequences of his act."

In this case it is undisputed that when he executed this deed deceased was in the last stages of lingering tuberculosis, distressed with a serious and annoying cough, old, weak and feeble, stricken with an incurable disease, and of short life expectancy. But a few

days before his death he deeded his entire property to a stranger in blood at whose house he was a guest, for an evidently inadequate consideration, the conditions of which rested in parol. Such facts in themselves tend strongly to prove undue influence. The fact that the deed was not attacked until after the grantor's death is of little significance where he survived so short a time. The case of *Davis* v. *Calvert*, 18 Ky. L. Rep. 975, is quite similar to this in the particular that following the grantor's death, which occurred within four months after executing a deed given in consideration of support, his grantee brought an action to correct a misdescription in the instrument making the grantor's heirs defendants, who in response asked affirmative relief and the deed was held invalid on similar grounds to those urged in the instant case.

Without extending this opinion to comment further upon the testimony, we conclude that this record fully supports the conclusions of the learned circuit judge that this deed was not only inequitable because for a grossly inadequate consideration, but that its execution was the result of undue influence at a time when deceased was so physically and mentally weakened by disease as to incapacitate him for intelligent and independent action in protection of his rights in such a transaction.

In March, 1917, plaintiff mortgaged the property in question for $600, much of which he expended in redeeming the premises from foreclosure sale under the past due mortgage which deceased had given, and payment of interest, back taxes, etc. The decree of the trial court holding the deed in question void takes cognizance of this and protects him from loss in that particular. It also protects his claim for support, medical services and burial of deceased by referring the matter to the probate court, making the same as

it may be there determined a lien in his favor upon said premises.

The decree is affirmed, with costs to defendants.

BIRD, C. J., and MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.